# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20339

United States Court of Appeals
Fifth Circuit

**FILED**
March 9, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SAMEH KHALED DANHACH, also known as Andrew,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Sameh Khaled Danhach was convicted by a jury of several criminal offenses relating to a scheme to steal and resell over-the-counter (OTC) medication, brand-name baby formula, and similar goods. He appeals the denial of a motion to suppress evidence found in a search of his warehouse, the sufficiency of the evidence supporting most of his counts of conviction, and his sentence. Finding no reversible error, we affirm.

## I. BACKGROUND

Danhach was indicted for acting as a high-level "fence": someone who receives stolen goods from "boosters" (thieves) and resells them for profit. The indictment alleged that Danhach and his partner, Alex Kheir, acting through

No. 14-20339

Houston-based companies called SKD Trading and Lifetime Wholesale, sold OTC medication and baby formula stolen from retail stores and pharmacies. A superseding indictment charged Danhach with conspiracy to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 371 (Count 1); aiding and abetting the interstate transportation of stolen OTC medication and baby formula, in violation of 18 U.S.C. §§ 2314 and 2 (Counts 2 through 4); and aiding and abetting the obstruction of justice by concealing or altering paper ledgers and a video recorder hard drive with evidentiary value, in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Counts 5 and 6).

Danhach filed a motion to suppress evidence seized from his Houston warehouse, arguing that government agents conducted an unlawful warrantless sweep of the building and then obtained an invalid search warrant by using illegally obtained information and falsifying the warrant affidavit. The district court denied that motion after holding an evidentiary hearing.

After a trial, the jury found Danhach guilty on all six counts, and the district judge denied his motion for a judgment of acquittal or a new trial. The district court imposed concurrent sentences of 60 months for the conspiracy count, 120 months for the interstate transportation of stolen goods counts, and 151 months for the obstruction of justice counts. The court also ordered concurrent three-year terms of supervised release and $100 special assessments for each count, and restitution of approximately $540,000. Danhach timely appealed.

## II. DISCUSSION

On appeal, Danhach argues that the district court should have (1) granted his motion to suppress, (2) ruled the evidence presented at trial insufficient to support five of his counts of conviction, and (3) sentenced him differently. We disagree for the following reasons.

2

No. 14-20339

## A. Motion to Suppress

Danhach first argues that the district court erred in failing to suppress evidence seized from his Houston warehouse pursuant to a search warrant. Where, as here, the district court denies a motion to suppress after hearing live testimony, we "accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law," but review de novo the "ultimate conclusion about the constitutionality of the law enforcement conduct." *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (citation omitted). "All evidence is viewed in the light most favorable to the prevailing party, here the Government." *United States v. Montgomery*, 777 F.3d 269, 272 (5th Cir. 2015). We "may affirm the district court's ruling on a motion to suppress based on any rationale supported by the record." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

Prior to the search, the Houston Police Department and FBI had been investigating Danhach and Kheir for their involvement with organized retail theft. During this investigation, agents had learned that Danhach and Kheir were using a particular warehouse, to which a car used for stealing OTC products had been linked. The agents had observed, among other things, people arriving at the warehouse to unload black trash bags—which investigators knew were often used to steal OTC products from stores. On March 1, 2012, agents surveilling the warehouse saw Kheir and an unidentified person enter the building; the agents then approached and knocked on the door in an effort to gain entry. Once inside, the agents saw indicators of a stolen OTC operation, which they cited to obtain a search warrant and seize evidence presented at trial.

The district court did not err in denying the motion to suppress. In their initial attempt to gain entry to the warehouse, the agents permissibly used the "knock and talk" technique, which we and other courts have "recognized . . . as

3

a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001); *see also Kentucky v. King*, 563 U.S. 452, 469 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."). The district court's factual finding that Kheir then permitted the officers to enter the building was far from clearly erroneous: it was supported by testimony that one of the agents asked Kheir for permission before Kheir allowed them inside, and by surveillance video consistent with that agent's account.[1]

Unrebutted testimony, again consistent with video evidence presented at the suppression hearing, establishes that, once the agents were inside the building, Kheir gave them permission to walk back to the main warehouse area to find an unidentified worker that Kheir had indicated was there. Uncontradicted evidence also supports the district court's finding that once the agents entered that area, they saw in plain view what immediately appeared to be stolen OTC medication and other items consistent with an organized retail theft operation. *See United States v. Jackson*, 596 F.3d 236, 242 (5th Cir. 2010) (explaining that evidence can be cited in support of a search warrant if "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item" (citation omitted)).  Indeed, from our review of the record, the district

---

[1] Because an agent testified that he asked for permission to enter and Kheir admitted them, this holding does not conflict with the Ninth Circuit case Danhach cites in support of his challenge.  *Cf. United States v. Shaibu*, 920 F.2d 1423, 1428 (9th Cir. 1990) ("We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent.  We will not infer both the request and the consent.").

court did not clearly err in finding that the agents lawfully observed all of the evidence cited in the affidavit supporting the search warrant.[2]

Even if any evidence cited in the warrant affidavit was not covered by the plain-view doctrine, the record supports the conclusion that the agents asked for—and Kheir gave—consent for a full search of the warehouse. In order to satisfy the consent exception to the Fourth Amendment's presumptive warrant requirement, "the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). Both Danhach and Kheir indicated that Kheir was in charge of the warehouse. Here, one of the agents consistently testified that, after he entered the main warehouse area and saw apparently stolen goods, he asked for and received Kheir's uncoerced oral consent to "search the warehouse." Danhach offered no evidence to rebut that testimony or show that he withdrew his oral consent.[3]

---

[2] The evidence supports the district court's finding that isolated pieces of evidence not immediately visible in the warehouse area—most importantly, a "booster list" of stolen items on a desk in the officer area of the building—were in plain view while the agents were lawfully attempting to get Kheir's written consent to search the building.

[3] Kheir declined to memorialize this consent in writing without first speaking to a lawyer. But declining to sign a consent form does not automatically withdraw previously given oral consent. *See United States v. Stevens*, 487 F.3d 232, 240–41 (5th Cir. 2007) (holding that a district court did not clearly err in finding consent where two agents testified that the defendant orally consented, but the defendant denied having orally consented and would not sign a written consent form); *United States v. Gomez-Diaz*, 712 F.2d 949, 950–52 (5th Cir. 1983) (upholding a finding that a defendant orally consented to an X-ray despite his refusal to sign a written consent form, when he did not resist being X-rayed and chose not to testify at the suppression hearing); *United States v. Garner*, No. 96-20490, 1997 WL 420227, at *1 (5th Cir. July 1, 1997) (per curiam) (holding that a district court did not clearly err in crediting agent's testimony that a defendant had orally consented despite his refusal to sign consent form). Kheir eventually spoke to an attorney and refused to sign the form, but only after the agents had already seen the evidence cited in the affidavit, and the affiant had left the warehouse to draft the affidavit.

No. 14-20339

Thus, the consent and plain-view exceptions justified all of the observations used to obtain the search warrant.[4]

Finally, Danhach argues that the search warrant was invalid under *Franks v. Delaware*, 438 U.S. 154 (1971), because the affidavit supporting it contained materially false or misleading information. We are unpersuaded. If a defendant establishes by a preponderance of the evidence that false information was intentionally or recklessly included in an affidavit, the court must "excise the offensive language from the affidavit and determine whether the remaining portion would have established the necessary probable cause." *United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002) (citing *Franks*, 438 U.S. at 156–57). This rule also extends to material omissions, but only intentional or reckless ones. *See United States v. Martin*, 615 F.2d 318, 328–29 (5th Cir. 1980). If the defendant fails to meet his burden of proving "that false information was given intentionally or recklessly . . . or if the affidavit would have sufficiently provided probable cause without the false information, the warrant did not violate the Fourth Amendment and the evidence should not have been excluded." *Cavazos*, 288 F.3d at 710. Here, most of the alleged inaccuracies that Danhach identifies are simply not misstatements or omissions. As to the remainder, Danhach has not shown that any misstatement or omission was material, let alone reckless or intentional. Accordingly, the district court did not err in denying the motion to suppress.

---

[4] Danhach stresses that the agents took several photographs before leaving the warehouse to obtain the search warrant, and that the affiant consulted at least one of those photos. Several circuits have held that law-enforcement agents may photograph incriminating items in plain view. *See United States v. Mancari*, 463 F.3d 590, 596 (7th Cir. 2006); *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992); *United States v. Espinoza*, 641 F.2d 153, 166–67 (4th Cir. 1981). We need not address that issue, though, because (1) the district court did not clearly err in concluding that the photographs were not essential to drafting a sufficient affidavit, and (2) Kheir orally consented to a search the warehouse. Danhach also complains that agents opened a toolbox and moved the flap of another box, but even if those actions were improper, no evidence obtained thereby was cited in the affidavit.

## B. Sufficiency Issues

Danhach preserved all of his sufficiency-of-the-evidence objections by moving for acquittal in the district court.  Accordingly, we review each sufficiency challenge de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).  We thus "review[] the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

As to each conviction he challenges, Danhach was charged as an aider and abettor.  A defendant aids and abets a criminal venture when he associates with it, participates in it, and "seek[s] by his actions to make the venture succeed." *United States v. Ibarra-Zelaya*, 465 F.3d 596, 603 (5th Cir. 2006).  Additionally, Danhach does not appeal his conviction of conspiracy to transport stolen merchandise in interstate commerce.  And for each conviction Danhach does appeal, the jury was given a so-called "*Pinkerton* instruction," which Danhach does not contend was improper. *See Pinkerton v. United States*, 328 U.S. 640, 645–47 (1946); *see also United States v. Thomas*, 348 F.3d 78, 84–85 (5th Cir. 2003) (approving a *Pinkerton* instruction essentially identical to the one given here).  Under *Pinkerton*, "a conspirator can be found guilty of a substantive offense committed by a co-conspirator and in furtherance of the conspiracy, so long as the co-conspirator's acts are reasonably foreseeable." *United States v. Mata*, 491 F.3d 237, 242 n.1 (5th Cir. 2007).  We hold that, at minimum, each of Danhach's substantive convictions was valid under *Pinkerton*.

Danhach first argues that insufficient evidence supported his three convictions for aiding and abetting the interstate transportation of stolen property under 18 U.S.C. § 2314.  To establish that offense, "the government

must prove: (1) the interstate transportation of (2) goods, merchandise, wares, money, or securities valued at $5,000 or more . . . (3) with knowledge that such items have been stolen, converted, or taken by fraud." *United States v. Onyiego*, 286 F.3d 249, 253 (5th Cir. 2002).

Danhach's first § 2314 conviction was based on a shipment of OTC medication from Maryland to an apparently fictitious "Ninja Compani" at an address associated with FedEx accounts registered to Danhach's companies. That package, which Kheir attempted to pick up, contained OTC medication worth approximately $5,900. Plenty of evidence supported the jury's conclusion that the medication was stolen. Most notably, many of the products in the package had CVS antitheft devices and CVS store numbers attached, and a CVS investigator was able to trace some products to the stores from which they came. The package also contained a "booster list"—an inventory of stolen goods commonly used for illicit accounting and payment purposes.

Moreover, there was sufficient evidence for the jury to conclude that the shipment was foreseeably made in furtherance of a conspiracy, which Danhach joined, to steal and resell OTC medication. This evidence included: (1) testimony that boosters were arrested with stolen OTC medication in multiple states while driving vehicles rented by Danhach; (2) a booster's testimony about stealing and selling OTC products to Danhach for about two years; (3) the stolen OTC medication and supplies used to "clean" such products for resale that were found in Danhach's warehouse; (4) testimony that Danhach removed store-identifying labels from OTC medication and showed an employee how to do the same; (5) evidence that Danhach sold OTC medication at prices lower than those at which Wal-Mart—the largest-volume seller of many of the products—would be able to purchase the products from the manufacturers; and (6) testimony from another Houston-area fence that Danhach was known to be a fence for OTC medication. Viewed in the light

most favorable to the jury's verdict, this evidence adequately supports Danhach's Count 2 conviction. *See United States v. Vontsteen*, 872 F.2d 626, 630–31 (5th Cir. 1989) (affirming aiding and abetting conviction under § 2314 where there was sufficient evidence that either the defendant or an accomplice acting on the defendant's instructions had arranged for a third party to transport stolen property).

Danhach's other § 2314 convictions were based on baby formula shipped from Lifetime Wholesale to New Jersey on February 24 and 28, 2012. Contrary to Danhach's arguments, there was sufficient evidence for the jury to conclude that these interstate shipments consisted of stolen baby formula. Most damningly, an employee of Abbott Nutrition, which manufactures a leading brand of baby formula, was able to "clearly identify" his company's formula in surveillance photographs of the warehouse on February 24 and 28, and testified that the formula was not packaged as it would have been had it come from Abbott.  The same witness testified that the prices at which Danhach sold brand-name baby formula were suspicious because they were significantly below Abbott's wholesale prices, and because Abbott would buy back any outdated or damaged merchandise, so that its customers had no reason to dump it below cost.  The jury also heard sufficient evidence to conclude that the shipments of three and two pallets of baby formula, respectively, were worth more than $5,000.  Each pallet of Abbott formula wholesales for no less than $11,000, and Danhach's company spent over $4,970 just in shipping charges for the February 24 shipment.  Finally, considering the evidence presented at trial, the jury reasonably could have concluded that Danhach directly participated in these shipments of stolen baby formula from Danhach's warehouse under his company's name—or at the very least, that the shipments were a foreseeable part of the conspiracy that Danhach does not

challenge on appeal.[5]    *See Ibarra-Zelaya*, 465 F.3d at 603 ("The evidence supporting a conspiracy convictions is generally sufficient to support an aiding and abetting conviction as well." (citation omitted)).    Thus, sufficient evidence supported Danhach's convictions on Counts 3 and 4.

Danhach also challenges his two convictions for aiding and abetting obstruction of justice in violation of 18 U.S.C. § 1512(c)(1).    A person commits this offense when he "corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding."    18 U.S.C. § 1512(c)(1).

One of these counts was based on Kheir's concealment of a hard drive containing video footage of the warehouse, which the parties stipulated was placed in the attic or ceiling of the warehouse on March 1, 2012, "after agents appeared at the warehouse but before the search warrant was executed."    In two recorded jailhouse calls that Danhach made to Kheir, Danhach—speaking mostly in Arabic and seemingly making a conscious effort to be vague— instructed Kheir to "remove" something, referenced an "attic," and warned him that he would be searched when he left the warehouse.    Just after these calls, Kheir locked the warehouse door, and the video recordings stored on the hard drive skipped and then ceased.    The jury reasonably could have inferred from these facts that Danhach directed Kheir to hide the hard drive from law enforcement agents, which Kheir did.    Therefore, sufficient evidence supports Danhach's Count 6 conviction for aiding and abetting obstruction of justice.

---

[5] Video evidence showed Danhach, Kheir, and their employee counting and preparing baby formula for shipment in the relevant time frame.    Additionally, a witness who worked for Danhach and a rival fence both testified that baby formula was part of Danhach's fencing operation.

Similarly, the jury reasonably could have convicted Danhach of obstruction of justice based on Kheir's concealment of a Gucci bag, which Kheir retrieved from Danhach's residence on the day of Danhach's arrest, and which contained ledgers detailing illicit transactions. When he went to retrieve the bag, Kheir told Danhach's landlord that Danhach had called and asked him to pick up some of Danhach's paperwork; at the landlord's request, Kheir wrote a letter confirming that he had Danhach's permission. Viewing the evidence in the light most favorable to the verdict, the jury could have concluded that this attempt to conceal the ledgers from law enforcement agents was a reasonably foreseeable act in furtherance of the conspiracy Danhach joined. Accordingly, we conclude that sufficient evidence supports Danhach's Count 5 conviction as well.

## C. Sentencing Issues

Danhach objects to two aspects of his sentencing. First, he argues that the district court erred when it estimated the loss amount attributable to his crimes to be $2,931,057.30, resulting in an eighteen-level enhancement. The Government bears the burden of proving sentencing enhancements by a preponderance of the evidence. *United States v. Ramos-Delgado*, 763 F.3d 398, 400 (5th Cir. 2014). Under the relevant Sentencing Guideline, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) cmt n.3(A) (2013). Importantly, "[t]he court need only make a reasonable estimate of the loss," and the sentencing judge's "unique position to assess the evidence and estimate the loss based upon that evidence" entitles the district court's estimate to deference. *Id.* cmt n.3(C). We have held "that the fair market value of stolen goods should reflect the market in which the victim merchant would have sold them." *United States v. Lige*, 635 F.3d 668, 672 (5th Cir. 2011). The district court's loss-amount calculation is a factual finding reviewed for clear error. *United States v. Beacham*, 774 F.3d 267, 278 (5th Cir. 2014).

11

The district court adopted the loss-amount estimate in the Presentence Report (PSR), which relied on ledgers that were found in the Gucci bag discussed above and that, according to the PSR, reflect Danhach's dealings in stolen products. The PSR included a chart listing sales, costs, and profits between August 1, 2011, and January 15, 2012. Summing these figures, the PSR held Danhach accountable for sales of $2,825,638 as a measure of intended loss. The PSR added about $105,000 to that sum to account for the retail value of the products that Kheir attempted to pick up at FedEx, and those that were seized from the warehouse on March 1, 2012.[6]

A district court may rely upon information in the PSR in making its loss-amount estimate, so long as that "information bears some indicia of reliability." *United States v. Simpson*, 741 F.3d 539, 557 (5th Cir. 2014). And if a defendant challenges the PSR, he "bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue." *Id.* Danhach has not met that burden. As he did below, Danhach contends that the PSR's methodology is "speculative and arbitrary." He also criticizes the PSR's conclusion that all of the business dealings recorded in the ledgers involved stolen goods. But he points to no evidence that any transaction was legitimate, or to any other evidence that rebuts the PSR on the loss amount. Accordingly, his challenge on this issue fails.

Second, Danhach argues that the district court erred in imposing separate $100 special assessments for each of his obstruction-of-justice convictions. Because Danhach did not raise this objection below, we review it only for plain error. *See United States v. Hughes*, 726 F.3d 656, 659 (5th Cir. 2013). Under this standard of review, "[w]hen there was (1) an error below,

---

[6] Under the version of the Sentencing Guidelines applicable when Danhach was sentenced, the threshold for the eighteen-level loss-amount enhancement for crimes involving stolen property was $2,500,000. U.S.S.G. § 2B1.1(b)(1)(J) (2013).

that was (2) clear and obvious, and that (3) affected the defendant's substantial rights, a 'court of appeals has the *discretion* to correct it but no obligation to do so.'" *Id.* (quoting *United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010)). This court, however, should "remedy the error *only* if it 'seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Trejo*, 610 F.3d at 319 (quoting *United States v. Olano*, 507 U.S. 725, 735–36 (1993)).

Danhach has shown no error, let alone plain error.  He relies on *United States v. Kimbrough*, in which this court held that the government had impermissibly divided a single child pornography offense into two counts.  69 F.3d 723, 728–30 (5th Cir. 1995).  That division violated "the rule against multiplicity," which stems from the Fifth Amendment's prohibition against double jeopardy, "and is intended to prevent multiple punishments for the same act."  *Id.* at 729.  In rejecting the prosecution's argument that "the grouping of the offenses by the trial court under the Sentencing Guidelines removed the danger of multiple punishments," we stated: "for double jeopardy purposes, sentences are not truly concurrent where a mandatory special assessment is separately imposed on each conviction."  *Id.*  *Kimbrough* is inapposite because in this case—as shown by the discussion above—Danhach's two obstruction convictions were based on distinct criminal acts.  Therefore, there was no violation of the rule against multiplicity, and no error in imposing concurrent sentences and separate special assessments for Counts 5 and 6.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment in its entirety.